No. 33,533

MINNIE STAYTON, *Appellant*, v. HENRY STAYTON et al., *Appellees*.
(81 P. 2d 1)

Opinion filed July 9, 1938.

W. L. Cunningham, D. Arthur Walker, Wm. E. Cunningham, all of Arkansas City, for the appellant.

H. W. Goodwin, W. H. Schwinn and John Potucek, all of Wellington, for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This was an action to contest a will. Judgment was for defendants, and plaintiff appeals.

On the 20th day of February, 1935, Sam M. Stayton executed his last will and testament. He died on March 5, 1935, and his will was probated on the —— day of March, 1935.

By his will Sam M. Stayton devised to his wife, Minnie Stayton, plaintiff herein, the home place in Wellington. He directed that all the rest and residue of his estate (except his interest in the Rush-Stayton Motor Company) be sold within two years after his death, and out of the fund created by the sale of his property he devised and bequeathed an undivided one half to his wife, Minnie Stayton.

Of the remaining one half he gave $7,500 to his sister, Mrs. Jack Connor, $2,500 to a brother, Fred Stayton, and the balance to his five brothers and sisters, share and share alike. He also provided that his partner, Rush, should have a prior right to purchase "my one-half interest in the firm business of the Rush-Stayton Motor Company."

This suit was instituted by the plaintiff, Minnie Stayton, as the widow and sole heir at law of Sam M. Stayton, deceased, contesting the validity of the will.

The petition charged that for ten years prior to his death Sam M. Stayton had been highly nervous, erratic, subject to frequently recurring spells of depression and mental and nervous disorders, subject to delusions of oppression and persecution, and was easily influenced by his brothers and sisters; that for a period of eighteen months prior to his death his brothers and sisters carried on a plan of conspiracy to poison and alienate the mind and affection of Sam M. Stayton against his wife, and to turn him against his wife and to induce him to make a will devising as much of his property as was possible to his brothers and sisters. That in pursuance to such plan they made false statements to Sam M. Stay-

ton that plaintiff did not love her husband, had no affection for him, desired to take his life, intended to poison or shoot him, and that it was dangerous to longer live with the plaintiff; that on February 5, 1935, Sam M. Stayton, on account of his mental and physical condition, was taken to the Hatcher Hospital at Wellington, where his brothers and sisters continued the plan and conspiracy to alienate his affection for his wife, and that such conduct was continued until his death. It was alleged that the brothers and sisters procured and induced Sam M. Stayton to sign the purported will, which he would not have signed except for such undue influence and his unsound mind. That he was not mentally competent to execute the will, but that his brothers and sisters procured and induced him to sign the will when he was of unsound mind, was mentally incompetent to sign it, and was wholly under their influence and control.

A trial was had before the court, and testimony supporting the claims of the respective parties was presented to the court. A demurrer to the evidence introduced on behalf of the plaintiff was interposed by defendants. The demurrer was sustained by the court as to the charge of undue influence and restraint on the part of the brothers and sisters. Thereupon the trial proceeded solely on the issue as to the testamentary capacity of the testator.

The court made findings of fact and conclusions of law, which are in part as follows:

"6. With reference to this issue as to whether Sam M. Stayton possessed the testamentary capacity required by law to make a valid last will and testament the court, after a due and careful consideration of all the competent testimony of the whole case, finds and determines the issue in favor of the defendants, finding that the said testator, Sam M. Stayton, at the time of the making and execution of said last will and testament, did possess that testamentary capacity which the law requires in the making of a valid last will and testament.

"9. Following these rules of law as expressed in the opinions of our state supreme court and in determining the facts as the court finds the facts to be as disclosed from the evidence of the whole case, we find that the testator spent practically his entire life in Sumner county, Kansas. That during his childhood days his mother was an invalid, and that his sister, Anna Connor, one of the defendants in this case, helped a great deal in the care of the boy Sam. That he was the youngest of the boys of the family and resided at the home of his parents until his marriage to the plaintiff on May 20, 1908, from which time, until his death on March 5, 1935, the plaintiff and the testator lived together as husband and wife. Sam Stayton in his lifetime was quite actively engaged in the business of farming, raising stock, feeding cattle, buying and selling horses, mules and other livestock, and was also engaged in the

automobile business as one of the partners in the firm of the Rush-Stayton Motor Company of Wellington, Kan.

"10. It further appears from the evidence that the testator and the plaintiff suffered some domestic strife during the spring of the year, 1934, but an apparent reconciliation of these domestic troubles had been effected prior to the commencement of the year 1935. During the spring and summer of 1934 the testator had worried a great deal about his domestic difficulties with the plaintiff, but a great improvement had taken place in his mental attitude with reference to said matters, and in the fall of 1934 the testator had engaged in not only ordinary but many complicated business affairs. He had bought cattle and hogs to feed during the winter; owning between 250 and 300 head of cattle and borrowing from the bank with which he was doing business as much as $8,000 at a time, selling some of the stock from time to time when the markets appeared favorable and making payments on the notes for the money borrowed for such purposes. All of such dealings proved profitable and it appeared that during all of such times the testator was able to carry on business in his usual way.

"11. It further appears from the evidence that at practically all times during his marriage with the plaintiff the relationship between the plaintiff and the testator's brothers and sisters was not entirely cordial. That the testator and his brothers and sisters at all times maintained cordial relations and consulted with each other concerning their business affairs.

"12. On the 5th day of February, 1935, Sam M. Stayton entered the Hatcher Hospital as a patient and there he remained until his death on the 5th day of March, 1935. His death was the result of a septicaemia induced by an ulcerating bacterial endocarditis which was of a recent origin and which developed by an acute process. It was while he was a patient in said hospital during his said last sickness, and on the 20th day of February, 1935, during the first hour of the day following midnight that he made and executed this last will and testament which is now the subject of this contest.

"13. The court finds that at the time of the making of said will the testator, Sam M. Stayton, was of sound and disposing mind and memory, possessing that testamentary capacity which has heretofore in this opinion been referred to. It appears that he had numerous callers while he was sick at the hospital, consisting of his wife and their intimate friends, his brothers and sisters, and his business friends. That he recognized said persons, calling them by name and carrying on a conversation with them about current events and in regard to business matters.

"14. The court finds that at the time of the preparation of said last will and testament the testator selected the attorney whom he desired to draft said instrument after being unable to secure his usual counsel, and that he was able to dictate the terms of said instrument. That he was acquainted with the property which he owned; that he was able to determine who were the proper objects of his bounty and as to the provisions to be made for each as he desired. That he was able to understand the terms of said will when it was read to him and suggested some changes which he directed to be made and which were made by pen and ink interlineation at the time and prior to the attaching of his signature to said instrument. That he was able to give his at-

torney, the scrivener of said will, explicit instructions relative to the terms thereof, and that at said time he displayed a clear knowledge of the business he was then transacting.

"15. The court finds that both prior to the making of said will and subsequent thereto the said testator was at all times in possession of his mental faculties and qualified to dictate the terms of his said will. That said mental sufficiency existed up until two days prior to his death, which occurred on the 5th day of March, 1935.

"16. The court further finds that said testator was the owner of an undivided one-fourth interest in the partnership of the Rush-Stayton Motor Company, of Wellington, Kan. That pursuant to inventory filed in probate court having jurisdiction of the administration of the estate of the said decedent it appears that the gross value of said estate is $58,832.86. It also appears that mortgage debts and claims allowed against the estate of said decedent in said probate court amount to the sum of $18,535, and that the net value of said estate approximates the sum of $40,297.86.

"17. As a matter of law, the court concludes that the instrument of writing purporting to be the last will and testament of Sam M. Stayton, deceased, admitted to probate in the probate court of Sumner county, Kansas, on the——— day of March, 1935, is in every respect valid and entitled to full faith and credit as the last will and testament of the said testator, Sam M. Stayton, deceased, and that judgment be entered in harmony herewith."

The abstract is voluminous and it is impossible to detail the evidence. It is not seriously contended that there was any substantial testimony to support the charge of undue influence. On the question of testamentary capacity the testimony was conflicting. There was, however, sufficient testimony to support the findings of the court that the testator was mentally competent to make the will. In this state of the record the findings of fact are conclusive on appeal. (*Anderson v. Anderson,* 147 Kan. 273, 76 P. 2d 825; *Gilpin v. Burch,* 145 Kan. 224, 65 P. 2d 308; *Gorman v. Hickey,* 145 Kan. 54, 64 P. 2d 587; *Steward v. Marker,* 143 Kan. 860, 57 P. 2d 75; *Bradley v. Hill,* 141 Kan. 602, 42 P. 2d 580.)

We proceed to an examination of the errors assigned and pressed upon us in plaintiff's brief.

1. Did the court commit error in sustaining defendants' demurrer to the evidence on the issue of undue influence?

In *Holmes v. Campbell College,* 87 Kan. 597, 125 Pac. 25, an action was brought to set aside a will on the ground of undue influence and want of testamentary capacity. A demurrer to the evidence was sustained as far as related to undue influence, and the trial proceeded on the issue of testamentary capacity. No question seems to

have been raised as to the propriety of this practice. In this case, at the time the demurrer was sustained the court had before it all of the evidence of the plaintiff as to any undue influence that was exercised over the testator, and all of plaintiff's evidence as to the mental and physical capacity of the testator. The court found that the plaintiff had failed to make a *prima facie* case as to the charge of undue influence.

Text writers usually treat undue influence and want of testamentary capacity as separate and distinct grounds upon which a will may be impeached. (68 C. J. 424, 743; 1 Page on Wills, chapters 8 and 10.) This was evidently the view taken in *Holmes v. Campbell College,* supra. As it is not shown that the plaintiff was prejudiced in any way by the action of the court, we do not think the ruling constituted reversible error.

2. Attending physicians of Sam M. Stayton were permitted to testify to facts which they had acquired professionally touching the testamentary capacity of the testator over the objection of plaintiff.

It appears, however, that plaintiff had called Doctor Fellows, who had attended the testator while in the Menninger Hospital and who, on direct examination, testified at length as to his mental condition.

Under the rule laid down by this court in *Chaffee v. Kaufman,* 113 Kan. 254, 214 Pac. 618, the plaintiff, having introduced a witness on his own behalf, waived objection to the testimony of the two physicians called on behalf of the defendants. (See, also, *In re Quick's Estate,* 161 Wash. 537, 297 Pac. 198.)

3. Plaintiff contends that improper hypothetical questions were propounded to expert witnesses. Doctor Hatcher, operator of the Hatcher Hospital, and Doctor Howell, a physician at the hospital, testified on behalf of defendants. Both doctors were in attendance on the testator while in the hospital. The testimony of these witnesses as to the mental condition of the testator was for the most part based upon their personal observation. Where personal observation is had hypothetical questions are unnecessary. (1 Wigmore on Evidence, § 675.)

In *Connecticut Mut. Life Ins. Co. v. Lathrop,* 111 U. S. 612, 618, 4 S. Ct. 533, 28 L. Ed. 536, it was said:

" . . . Thus, the opinions of medical men are admissible in evidence as to the sanity or insanity of a person at a particular time, because they are supposed to have become, by study and experience, familiar with the symp-

toms of mental disease, and therefore qualified to assist the court or jury in reaching a correct conclusion. And such opinions of medical experts may be based as well upon facts within their personal knowledge as upon a hypothetical case disclosed by the testimony of others. . . ."

In *State v. Felter*, 25 Ia. 67, 75, Dillon, C. J., speaking for the court, said:

" . . . If a physician visits a person, and, from actual examination or observation, becomes acquainted with his mental condition, he may give an opinion respecting such mental condition at that time. . . ."

In *Bellefontaine & Indiana Railroad Company v. Bailey*, 11 Ohio St. 333, 337, it was said:

"If an expert may give his opinion on facts testified to by others, we see no reason why he may not do so on facts presumably within his own personal knowledge; . . ."

Where an expert witness, called to give his opinion, has had no personal observation of the data on which his opinion is to be based, the expert must have such data stated to him hypothetically in the question. (*George v. Shannon*, 92 Kan. 801, 142 Pac. 967.) It is then possible for the court or jury to reject his opinion later if they do not accept the data upon which the opinion was based.

The testimony of these physicians as to the mental condition of the testator was based on the daily observation of the testator while in the hospital during his last illness. One question, in hypothetical form, propounded to Doctor Howell, was as follows:

"Q. Assuming, Doctor, that, in order for a man to be competent to make a will, it is necessary for him to be able to understand what his property consists of, who his relatives or-friends and who are the natural objects of his bounty, and also know what he wants to do with his property, would you say that, during that period, Mr. Stayton was or was not competent to make a will?

"Attorney for plaintiff: Object to that; the hypothetical question doesn't contain the necessary elements that constitute the soundness of mind.

"Court: Objection overruled.

"A. I believe that he was."

In *Stecher v. London Guarantee & Accident Co.*, 133 Kan. 89, 298 Pac. 754, paragraph 4 of the syllabus reads:

"While all undisputed elements and features of the case relating to the subject on which an expert opinion is being sought by way of an answer to a hypothetical question should be contained in the question, yet it is not necessary to include all the details of such elements or features."

The test of mental capacity outlined in the hypothetical question has in substance been approved by this court many times. (*Hud-*

*son v. Hughan,* 56 Kan. 152, 42 Pac. 701; *Cole v. Drum,* 109 Kan. 148, 197 Pac. 1105; *Barnhill v. Miller,* 114 Kan. 73, 217 Pac. 274; *Klose v. Collins,* 137 Kan. 321, 20 P. 2d 494.)

We find no error in the admission of the testimony of these witnesses.

Objection is also made to a question propounded to Doctor Fellows, a witness on the part of the plaintiff. It referred to the mental capacity of the testator in March, 1934, nearly a year before the will was signed. It had slight bearing on the case and was well within the latitude allowed on cross-examination.

4. Complaint is made that one of the defendants, Mrs. Jack Connor, was permitted to testify to transactions and communications had with the testator in violation of the statute, G. S. 1935, 60-2804. The will made a bequest to Mrs. Connor in the sum of $7,500. She was asked: "During his boyhood, who assisted in caring for him?" She answered: "I certainly did." The question was objected to as concerning a transaction between the witness and Sam M. Stayton, a deceased person.

The plaintiff testified that she was married to Sam M. Stayton on May 20, 1908. We are asked, then, to hold that the term "transaction" as used in the statute should be stretched to cover a segment of family history at least thirty-five years before the death of the testator. A mere statement that the witness assisted in caring for the testator during his boyhood could not be construed to be a transaction within the meaning of the statute.

This witness was asked: "Did Sam visit at your house?" She answered: "He certainly did."

We have held that a defendant may testify as to the mental condition of the testator. "These questions were not propounded for the purpose of placing before the jury any transaction with, or conversation of, the deceased, but for the purpose of apprising the jury of the mental condition of deceased at and before the execution of the contract." (*Grimshaw v. Kent,* 67 Kan. 463, 466, 73 Pac. 92. See, also, *Loveless v. Ott,* 121 Kan. 728, 250 Pac. 324.)

In *Seligman v. Hammond,* 205 Wis. 199, 236 N. W. 115 (*Seligman v. Orth*), in discussing a similar statute, the court said:

"We think the transaction meant in section 325.16 is a personal transaction with the deceased; a transaction in which each is an active participant, and that it does not prohibit the survivor from describing an event or physical situation, or the movements or actions of a deceased person, quite independent

and apart, and in no way connected with, or prompted or influenced by reason of, the conduct of the party testifying. . . ."

A mere statement of an event, as a visit by the deceased to the witness, where it is not shown that such visit was prompted or influenced by the witness, is not within the ban of the statute.

We have examined the record as to the testimony of other witnesses which, it is argued, was admitted in violation of G. S. 1935, 60-2804. Part of this testimony was stricken, and the other portions were unobjectionable under the rules above announced.

Other assignments of error were argued at length, but the view that has been taken disposes of those that are deemed to be material, and a reference to them in detail appears to be unnecessary.

Finding no material error in the record, the judgment is affirmed.